But if UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**BOBBY WALKER, JR. ,**

      **Plaintiff,**

**v.**                                     **Case No: 8:15-cv-2246-T-27TGW**

**INDIAN RIVER TRANSPORT
COMPANY,**

      **Defendant.**

_____/

## ORDER

    **BEFORE THE COURT** are Defendant's Revised Motion for Summary Judgment (Dkt. 22), Plaintiff's response (Dkt. 23), and Defendant's reply (Dkt. 24). Bobby Walker, Jr. sues his former employer, Indian River Transport Company, for religious discrimination, failure to accommodate, and retaliation under Title VII of the Civil Rights Act of 1964, arising from his request for Sundays off to attend religious services.

    The undisputed facts demonstrate that after Walker requested Sundays off, Indian River provided him a reasonable accommodation. He never suffered an adverse employment action and was not constructively discharged or retaliated against for requesting Sundays off or for filing an EEOC complaint. Accordingly, Walker's disparate treatment/failure to accommodate and retaliation claims fail and Defendant's Revised Motion for Summary Judgment is GRANTED.

## I.    UNDISPUTED PREDICATE FACTS

    Walker is a member of the Kingdom Hall of Jehovah's Witnesses. He began working for Indian River in November of 2013 as a truck driver. (Walker Dep. at 8:10-15, 122:15-25, 178:24-

1

179:4). When he was hired, he requested local routes, because "there was no guarantee that I would

be available on Sunday when I'm doing a 70-hour cock, because the 70-hour clock could start on a

Sunday or it could start on a Monday or whatever." (*Id.* at 82). Since no local routes were available,

he was initially assigned an "over-the-road" run, and in January 2014, he was assigned a regional run

to Georgia. (*Id.* at 44:19-45:3, 79:23-80:10). In March 2014, he was assigned to a new account for

Indian River, a run hauling milk from Shenendoah Dairy in Live Oak, Florida to the T.G. Lee plant

in Orlando. ("T.G. Lee run") (*Id.* at 181:17-21 , Ex. 27).

     Two weeks after he was assigned the T.G. Lee run, on the evening of Saturday, March 15,

2016, while waiting to unload at the T.G Lee plant and concerned that he would have to wait until

Monday to unload, Walker sent a message to Indian Rivers' dispatch office:

> I said, well, I got this Saturday load in so maybe I'll get unloaded or unload before
> the night is out. Hopefully I do so I won't be waiting until tomorrow since there's not
> that many trucks here, I guess. And I went on to say . . . since it's obvious that it
> doesn't make sense to wait almost a whole day on Sunday to get unloaded when the
> darn T.G. Lee company . . . actually closes or shuts down until Monday the next
> morning.

(*Id.* at 97:18-25). He then requested Sundays off to attend religious services. (*Id.* at 98:6-24).[1]

     The next day, Walker met with Angel Deliz, his dispatch supervisor, and manager Todd

Godwin. (*Id.* at 103:8-14; Deliz Dep., Dkt. 14-1 at 38:2-22). According to Walker, Godwin told him

"this is not really about your religion but you can't let it get in the way" and Deliz said "my wife is

real serious about her church too . . . but she'll put her job ahead of that." (Walker Dep. at 104:13-16,

---

[1] According to Walker, Jehovah's Witnessess are not restricted from working on their Sabbath day. (Walker
Dep. at 9-10, 126). And he never requested Sundays off from any employer before Indian River. (*Id.* at 43-46). Nor
did he request Sundays off while driving over-the-road for Indian River (*Id.* at 79-81).

109:1-6, 110:7-11).[2] Walker was told he was off the T.G. Lee run because he could not be there on Sundays and that they would find something else for him. (*Id.* at 110:16-120). Deliz suggested they put him on local day-to-day runs that were more flexible. (Deliz Dep. at 38:23-39:17).

## II.   STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials on file, that there are no genuine disputes of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party fails to demonstrate the absence of a genuine dispute, the motion should be denied. *Kernel Records*, 694 F.3d at 1300 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991)).

Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial. *Dietz v. Smithkline Beecham*

---

[2] As Indian River points out, Walker surreptitiously recorded this conversation with his cell phone, but failed to retain the recording (Walker Dep. at 158-59) (Q: So the meeting that you had with Angel, and Todd Godwin, you recorded that without their knowledge? A: Probably did. Q: Where is that recording? A: I have no idea right now.).

*Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). The nonmoving party must "go beyond the pleadings," and designate specific facts showing that there is a genuine dispute. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). A mere scintilla of evidence in the form of conclusory allegations, legal conclusions, or evidence that is merely colorable or not significantly probative of a disputed fact cannot satisfy a party's burden. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991); *Kernel Records*, 694 F.3d at 1301.

The evidence presented must be viewed in the light most favorable to the nonmoving party. *Ross v. Jefferson Cnty. Dep't of Health*, 701 F.3d 655, 658 (11th Cir. 2012). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). "Although all justifiable inferences are to be drawn in favor of the nonmoving party," *Baldwin Cnty. v. Purcell*, 971 F.2d 1558, 1563-64 (11th Cir. 1992), "inferences based upon speculation are not reasonable." *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine dispute over a material fact, the court should not grant summary judgment. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1998). However, if the nonmovant's response consists of nothing more than a repetition of conclusory allegations, summary judgment is not only proper, but required. *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981), *cert. denied*, 456 U.S. 1010 (1982).

## III.   DISCUSSION

### A.   Disparate Treatment/ Failure to Accommodate claims under Title VII

In his Complaint, Walker alleges three causes of action: disparate treatment, failure to

4

accommodate, and retaliation. He argues them as separate claims in his response to Defendant's summary judgment motion. The Supreme Court explains, however, that "the rule for *disparate-treatment claims based on a failure to accommodate a religious practice* is straightforward: An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033, 192 L. Ed. 2d 35 (2015). As such, although pled as two distinct claims, Walker's disparate treatment and failure to accommodate claims will be treated together.

### Title VII

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer: "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. This proscription is referred to as the "disparate treatment" (or intentional discrimination) provision. *Abercrombie*, 135 S.Ct. at 2032.

Prior to *Abercrombie*, to establish a prima facie religious accommodation claim, a plaintiff was required to present evidence sufficient to prove that: (1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012); *Telfair v. Fed. Exp. Corp.*, 567 F. App'x 681, 683 (11th Cir. 2014).

After *Abercrombie*, a plaintiff "need only show that his need for an accommodation was a motivating factor in the employer's decision" and that actual knowledge of the need for an

accommodation is not required, making that second element suspect if not completely eliminated. *See Abercrombie*, 135 S.Ct. at 2032. It would seem, therefore, that the third element is more appropriately stated as: the employer made the plaintiff's religious practice a factor in an adverse employment decision. *See id.* at 2033. In other words, the employer may not take adverse action with the motive of avoiding the need for accommodating a religious practice. *Id.*

It is undisputed that Walker held a bona fide religious belief and requested Sundays off to attend religious services, and that his request conflicted with the T.G. Lee run, which required Sunday work. It is likewise undisputed that Walker's need for an accommodation was a motivating factor in Indian River's decision to remove him from the T.G. Lee run.

**B.**     **Inability to accommodate employee's religious beliefs without undue hardship**

Walker's disparate treatment/failure to accommodate claim is based on Indian River removing him from the T.G. Lee run, rather than accommodating his request for Sundays off. Title VII requires an employer to accommodate an employee's religious beliefs, so long as the accommodation does not impose undue hardship on the employer. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977); *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986) ("The employer violates the statute unless it 'demonstrates that [it] is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.'") (citing 42 U.S.C. § 2000e(j)).

It is undisputed that Indian River could not have, without suffering undue hardship, accommodated Walker's request for Sundays off while he was assigned to the T.G. Lee run.[3] It was

---

[3] In arguing that giving him Sundays off would not have caused hardship to Indian River (Dkt. 23, p. 11), Plaintiff relies on testimony that it was common practice to allow drivers, including Plaintiff, to take their trucks home and use them on personal errands, if "they're delivering to a plant that's close to their house . . ." This

essential for the drivers to be flexible, including being available to work on Sundays, in order to meet the needs of the dairy and its milk production schedule, which was seven days per week. Drivers were often required to wait unpredictable lengths of time or arrive early and on short notice. (*See* Deliz Dep. at 40:3-22, 42:2-43:1).

It is undisputed that the T.G. Lee account was problematic for Indian River and its drivers because at times, the drivers had to wait a long time before unloading. (Deliz Dep. at 17-18, 36-37, 42, 51, 74-75; Walker Dep. at 83, 85-86). And because milk was required to be loaded as it is produced, that required loading four to five tank-loads per day, seven days a week, including Sundays, and drivers had to be available to meet this need (Harned Dep. at 54; Ferguson Dep. at 24, 28-30). Walker admits that this run at times required driving on Sundays. (Walker Dep. at 182). Those requirements, and the distance between the dairy in Live Oak and the T.G. Lee plant, and the hours of service regulations applicable to drivers, required drivers with flexible schedules. (Harned Dep. at 555-57; Walker Dep. at 81-83; Deliz Dep. at 42-43, 49; 50). Because of the schedule, no driver could be promised a day off. (Harned Dep. at 54-55). And any loss of milk resulting from a scheduling mishap had financial ramifications for Indian River, as it would be responsible for those losses. (Deliz Dep. at 42-43; 51).

Indian River was therefore justified in declining Walker's request for Sundays off. As the record demonstrates, however, Walker was provided a reasonable accommodation, runs which did not require Sunday work.

---

testimony does not create a <u>material</u> issue of fact because it is not connected to the requirements of the T.G. Lee milk runs.

**C.**     **Reasonable accommodation**

An employer satisfies its obligation under Title VII by offering a reasonable accommodation of the employee's religious beliefs. *Philbrook*, 479 U.S. at 69 ("We accordingly hold that an employer has met its obligation under § 701(j) when it demonstrates that it has offered a reasonable accommodation to the employee"). A reasonable accommodation eliminates the conflict between employment requirements and the employee's religious practices. *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1322 (11th Cir. 2007).

However, an employer is not required to accommodate at all costs. *Id.* And the employer need not provide the employee a choice among several accommodations or provide the employee with the employee's preferred accommodation. *Walden*, 669 F.3d at 1293–94; *Telfair v. Fed. Exp. Corp.*, 567 F. App'x 681, 683 (11th Cir. 2014).[4] And finally, an employee has a duty to make a good faith attempt to accommodate his religious needs through the means offered by the employer. *Walden*, 669 F.3d at 1294 (quoting *Beadle v. Hillsborough Cty. Sheriff's Dep't*, 29 F.3d 589, 593 (11th Cir. 1994)).

**D.**     **Indian River offered a reasonable accommodation**

Walker argues that after he was removed from the T.G. Lee run, he was only offered runs that required Sunday work or had lower pay, and Indian River otherwise refused to give him work.

---

[4] To the extent, therefore, Plaintiff contends that Indian River should have provided him with his preferred accommodation of remaining on the T.G. Lee run (Plaintiff "informed Deliz and Godwin that he did not need the entire Sunday off; he just needed a couple of hours to attend his services: I can attend my services and come right back . . . Plaintiff wanted to be able to drop the trailer temporarily at T.G. Lee, go to the Kingdom Hall for services, and return.")(Dkt. 23, p. 3-4), Indian River was under no obligation to provide that accommodation.

Contrary to his argument, the record evidence demonstrates otherwise.[5] The undisputed evidence demonstrates not only that he was offered and drove several non-Sunday runs after being removed from the T.G. Lee run, but that he rejected runs because dispatch could not tell him in advance how much he would be paid, or he was unwilling to accept runs with long wait times. (Walker Dep. at 129; Exh 27).

The undisputed record evidence establishes that after Walker was removed from the T.G. Lee run, Indian River offered him alternative runs on a regular basis, some of which he accepted, and some of which he declined for reasons having nothing to do with his religious beliefs. By offering alternative non-Sunday runs, Indian River did all that it was reasonably required to do to accommodate Walker's religious beliefs, since those offers eliminated the conflict between the T.G. Lee run and Walker's desire to attend Sunday services. *Morrissette-Brown*, 506 F.3d at 1322 (quoting *Philbrook,* 479 U.S. at 70 (a reasonable accommodation "eliminates the conflict between employment requirements and religious practices")).

The undisputed record evidence also demonstrates numerous contacts between Indian River dispatchers and Walker after he was removed from the T.G. Lee run on March 15.[6] According to dispatcher Primavera, the only time she called Walker was to offer him a run, and there were times

---

[5] In addition, many of Walker's characterizations of the facts are not supported by his record citations. For example, Walker asserts that "Defendant refused Plaintiff's request for time off on Sundays," citing his deposition testimony, page 183, lines 7-16:

> Q   The next sentence: "Indian River agreed to accommodate his request, which required pulling him from the assigned run to Shenandoah Dairy." Do you disagree with any part of that?
> A   I definitely disagree with that, because it was not a requirement to pull me off the whole run for just a simple Sunday. And it was not necessary. I could have still done Monday, Tuesday, Wednesday, Thursday, Friday, Saturday, you know, and still do Sundays to a certain point. So that is something that I totally disagree with.

His testimony merely demonstrates his disagreement with the decision to take him off the T.G Lee run.

[6] For example, Indian River's telephone bills for the period between March 31 and May 3 included twenty-eight calls to Walker (Dkt. 14-8) and seventeen calls from Walker (Dkt. 14-9).

he rejected work, and times he complained about wait time for runs he did not want. (Primavera Dep. at 77-78, 81-88). And there were times when she could not get through to Walker (*Id.* at 84-95; Exh. N). On one occasion, he failed to deliver a load because of the wait time, instead dropping it at the yard for another driver to complete the delivery (*Id.* at 81-82).

Further, the evidence demonstrates that Walker drove runs during the weeks following his conversation with Deliz and Godwin on March 15. Indeed, Indian River's Movement Display chart demonstrates that he drove the T.G. Lee run on March 17 and 18. (Dkt. 14-13).[7] Dispatcher Primavera attempted to reach him on March 19, but there is no record of a return call (Primavera Dep. at 46). On March 25, Walker was called, and he drove the T.G. Lee run the next day. There was a three minute call to Walker on March 26. On March 27, he failed to show for a run he had committed to (Primavera Dep. at 43, 85. 87; Ferguson Dep. at 55-56).). And he worked on March 29.

The billing records and the Movement Display chart also demonstrate that there was a call on March 30, and several calls on March 31, and Walker drove a St. Petersburg run that day. He worked on April 1, but did not work again until April 21 (Dkts. 14-13 at 14-15, 14-17). But there were calls to and from Walker on April 7, 15, 16 and 18, and several calls on April 21. (Dkts. 14-8, 14-9). According to Ferguson, Walker was offered but declined work on April 18 (Ferguson at 33-34, 50-62, Exh. B). Walker worked on April 21 and April 22. And there were multiple calls on April 23. He was called on April 27 (a Sunday), and took a run to Bradenton. Multiple calls were made on April 29 and he worked that day and on April 30. (Dkt. 14-13 at Ex. 27 at 15).

On April 30, 2014, Walker was offered a run for the next day, but there is some dispute about

---

[7] Plaintiff does not challenge or show that the Movement Display chart is inaccurate.

whether he declined, or committed and failed to show. (Compare Dkt. 14-10, Exh. N at 9-11, Ex. C with Walker Dep. at 162:1-164:25).[8]

Walker was called six times on May 1, twice on May 2, and three times on May 3, (Walker at 132, Exh. 27). On Saturday, May 3, 2014, Walker was offered a run, which according to dispatcher Primavera, would have ended on Sunday May 4, but Walker refused it.[9] (Dkt. 14-10, Ex. N at 6-7). Walker mailed his letter of resignation on May 3, 2014. (Walker Dep. at 146:2-10, 149:9-21).

In summary, after his conversation with Deliz and Godwin on March 15, Walker worked March 17 (Monday), March 18 (Tuesday), March 25 (Tuesday), no-showed on March 27 (Thursday), worked March 29 (Saturday), March 31 (Sunday) and again on April 1 (Monday), April 21 (Monday), April 22 (Tuesday), April 27 (Sunday), April 29 (Tuesday) and April 30 (Wednesday). Attempts to contact him were made on March 19, 26 and 30, April 7, 15, 16, 18, 23, and on May 1, 2, and 3. He was offered a run on May 3, a Saturday, but he refused to work.[10]

---

[8] According to dispatcher Primavera's May 1 email to Ferguson, Walker "has been complaining because he wants a Dedicated run. He don't like wait time. He was confirmed on Umatilla to Arcadia run. He committed to a 1430 pickup today. He is at home and I have been calling him since 10am. I have left about 11 voice mails with not response. This orders are very important, if we miss the apt times we are billed $900. I have explained this to him and every driver I put on these runs. I can not make Mr. Bobby Walker Happy, I can not work with him. I can not just take a driver that actually does his job for a driver that cant." (Primavera Dep. at 37-43; Exh. C; Ferguson Dep. at 53-57).

[9] Defendant is correct that Walker conflates an incident he attributes to Indian River with a subsequent employer. Walker contends that Ferguson called him on May 3, 2014 when he was at the Kingdom Hall "and ordered him to hurry and finish so he could get the load that would run through Sunday, the following day," citing Walker's testimony. (Dkt. 23 at 9). However, Walker was testifying about being contacted by his subsequent employer, Bynum Transport, Inc., who contacted him on May 16, 2015 about personal use of their truck. (Walker Dep.at 226:5-227:14; Dkt. 25-1).

[10] Walker mailed his EEOC complaint on April 18, 2014. (Walker Dep. at 136, 153-54, Exh. 31). He asserts that the first time he was offered work after mailing his EEOC complaint was on Friday, April 18, 2014, "which was a weekend run that required Sunday work." (Dkt. 23 at 8). The evidence indicates, however, that Walker was called on Friday, April 18 and "offered for today and the weekend," which he declined. (Dkt. 14-10, Ex. L). Other than Walker's assertion, there is no indication that this offer necessarily required Sunday work. Accepting

That some of the runs offered Walker may have required Sunday work, or were lower paying runs than the T.G. Lee run, or involved longer wait times than were acceptable to him, does not render Indian River's attempt to accommodate him unreasonable. He was not required to work on Sundays. Notwithstanding, on occasion, he chose to work on Sundays. That some of the runs may have paid less than the T.G. Lee run does not make the accommodation unreasonable. *See Telfair*, 567 F. App'x at 684 (explaining that FedEx provided a reasonable accommodation when it offered different positions that satisfied the plaintiffs' scheduling criteria and moving plaintiffs to other positions that were lower paying did not make the accommodation unreasonable).[11]

**Employee has a duty of good faith**

In addition to an employer's duty to reasonably accommodate the religious practices of its employee, the employee has a duty to make a good faith attempt to accommodate his religious needs through means offered by the employer. *Beadle*, 29 F.3d at 593; *Philbrook*, 479 U.S. at 68 (recognizing employee's duty of "bilateral cooperation"); *Cosme v. Henderson*, 287 F.3d 152, 158 (2nd Cir. 2002) ("In formulating such an accommodation, both the employer and employee should remain flexible, with an eye toward achieving a mutually acceptable adjustment.").

Like any employee whose employer attempts to accommodate his religious beliefs, Walker had a duty to make a good faith attempt to accommodate his religious needs through the runs offered by Indian River. *Walden*, 669 F.3d at 1294; *See Bruff v. N. Mississippi Health Servs., Inc.*, 244 F.3d 495, 503 (5th Cir. 2001) ("[a]n employee has a duty to cooperate in achieving accommodation of his

---

Walker's statement as accurate for purposes of Defendant's motion, as noted, Walker worked the following Sunday, April 27 2014, and there is no evidence that he would have been disciplined had he refused.

[11] Walker does not remember what most of the runs he was offered paid, with the exception of one, for which he claims he only made $20. (*See* Walker Dep. at 159:19-25, 160:12-169:4, 198:1-199:18, 258:24-259:8).

[]religious beliefs, and must be flexible in achieving that end."). As noted, it is undisputed that Walker rejected runs for reasons having nothing to do with his religious beliefs.

**E.**   **Once a reasonable accommodation is offered, the Title VII inquiry ends**

Once an employer offers "any reasonable accommodation," that is sufficient to meet its accommodation obligation, and the inquiry ends. *Philbrook*, 479 U.S. at 68, 107 S.Ct. at 372. Considering the undisputed fact that Indian River offered runs to Walker which avoided the conflict with his religious beliefs, and that Walker accepted some runs and rejected others because he was not satisfied with his pay or wait time, even accepting all facts in a light most favorable to Walker, no reasonable jury could find that Indian River failed to reasonably accommodate Walker's religious beliefs. Accordingly, Defendant's motion as it relates to Walker's disparate treatment/failure to accommodate claim is due to be granted.

**F.**   **Walker was not subjected to an adverse employment action**

It is undisputed that Walker was never subjected to an adverse employment action or otherwise disciplined as a result of requesting Sundays off. "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268, 141 L. Ed.

2d 633 (1998).

Walker bases his claim of adverse employment action on, among other circumstances, his perception that Ferguson and Primavera became "very hostile" toward him after John Harned, the Vice President of Operations, purportedly told them to make him "disappear." These efforts, he contends, included removing him from the T.G. Lee run, assigning him primarily Sunday and lower-paying runs, subjecting him to heightened scrutiny, designating him as uncooperative, and giving him inferior and unsafe equipment. Notwithstanding, as will be discussed, none of these actions amount to an adverse employment action.

**Non-Sunday and lower paying runs**

While it is unclear how many non-Sunday runs Walker was offered, as discussed, it is undisputed that after he was removed from the T.G. Lee run, he worked nine non-Sundays and two Sundays, and declined work on April 18, a Friday, as well as on May 3. And it is undisputed that he rejected some runs which were offered because of his concern with low pay and long wait times. And while there was a three week period when he did not make any runs, it is undisputed that there were several phone calls to and from Walker during that time, specifically on April 7, 15, 16, 18 and 21. And, as noted, he declined work on April 18, but worked on April 21, 22, 27, 29, 30 and on May 1, 2 and 3. He was offered a run on May 3 but declined.

Unquestionably, "[a] reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006). Notwithstanding, there is no evidence that any Indian River driver was entitled to or guaranteed any particular number of runs or hours. Although Walker had no runs for approximately three weeks, there is no evidence that the reduction was

14

related to his religious beliefs, would occur again, resulted in a loss of benefits, or resulted in his constructive discharge. *See Cham v. Station Operators, Inc.*, 685 F.3d 87, 94–95 (1st Cir. 2012) (rejecting "out of hand" the "extreme argument that a one-week reduction amounts to a constructive discharge," particularly given that "fluctuate and no employee is entitled to any given shift." ). He undisputably made runs in mid- April, and was offered the run on April 18 which he refused. And he worked on April 21, 22, 27, 29 (Sunday), 30 and on May 1, 2 and 3, but declining a run on May 3. On this record, therefore, the reduction in runs for three weeks does not constitute a materially adverse employment action.

**Heightened surveillance and discipline**

As to his claim of heightened scrutiny, there is no evidence other than Walker's subjective perception and vague description that he was being watched, that "different employees" were "eyeing on [him] or pointing," and that during one phone call, Ferguson was "angry" and "stressing" Walker, (Walker Dep. at 202:12-203:21).[12] And, as noted, there is no evidence that he was subjected to any

---

[12] Walker's cited testimony on this is:

      A    I guess based on how Steve was just basically talking to me and demanding and claiming that I wasn't cooperating. And I 'm saying, what are you talking about, man? I mean, you know, he was just really, really trying to push it, you know, as far as, you know, just stressing me. I mean, he was showing his -- he was angry, obviously. He was angry. But the way he was really talking to me on the phone like that, I mean, gosh, man. And it was like, man, why are you so mad for.

      Q    Anything else?

      A    And -- no. I guess every time I go into the office, I guess, just kept an eye on me, big time, I guess. They watching me. That 's all. But I can understand why, because the case and everything. So that's understandable they' re checking you out more than others or something, you know, I guess.

      Q    What is the basis for the allegation that you were subject to selective surveillance? What kind of surveillance were you subjected to?

      A    I guess based on every time I entered the yard, I guess they were specifically eyeing on me or pointing or whatever. But, you know, I kind of expected that to happen anyway,

      Q    Who was eyeing and pointing?

      A    Different employees. I guess even when I went inside Steve's office one time -- or was it Ken's office? I don't know. And I even heard the ladies in the corner, that ' s him. That 's Bobby Walker. That's all. Okay. All right. It 's like that. All right. It was just simple little things

15

disciplinary action.

**Inferior and unsafe equipment**

In support of his contention that he truck was taken from him and he was provided inferior and unsafe vehicles in retaliation for requesting Sundays off, his testimony references two breakdowns, and constitutes unsupported speculation, at best. One involved his brakes "locking up." (Walker Dep. at 200:1-170). There is no evidence, however, about what caused that one-time incident. Walker's brief describes the other incident as Walker having been provided a truck with a "malfunctioning electrical or coolant system, which Defendant attempted to blame on Plaintiff." (Dkt. 23 at 11). However, the cited testimony makes no mention of this. And Defendant's description of it as only "a stop engine light, which involves a red light coming on in the dash indicating an active fault code, and de-rates the power of the engine," is not disputed (Dkt. 22 at 11 (citing Wisdom Dep. at 20)).

An email from Wisdom regarding the May 3 stop engine incident states:

> The driver of truck 10229 called this weekend with a red stop engine and power de-rate. He was asked if he had checked his water and oil to which he replied he had. When the on-road service arrived, they found the truck low of water. They topped off the water and the truck was fine. This driver's lack of performing a pre-trip inspection cost the company money that could have been avoided.

(Dkt. 14-16, Ex. A).

While Walker implies that the problem was wrongly blamed on him, there is no evidence that the email was false. And, it was sent on May 5, 2014, <u>after</u> Walker resigned. (*Id.*).

---

like that. It was like I had everybody's attention. I said, oh man, you know, and just walk on. That's all.
(Walker Dep. at 202:18-203:21).

**Characterizing Walker as "uncooperative," "problematic," and "a complainer"**

Walker contends that Steve Ferguson, Indian River's Director of Human Resources, labeled him as "problematic" because he requested Sundays off. (Dkt. 23 at 4-5). Significantly, however, he takes Ferguson's statement out of context. Ferguson actually said: "As per Angel's e-mail, [Walker] was problematic on [the T.G. Lee] run and one of the primary issues was . . . he requires Sundays off to attend church." (Harned Dep. at 28:4-21). This is not evidence of discrimination. To the contrary, as will be explained, it simply demonstrates that Walker's religious belief conflicted with the T.G. Lee run requirements, and was therefore understandably "problematic." Moreover, Angel Deliz, Walker's dispatcher at the time, testified that the main issue he was having with Walker was him taking a load home and not contacting Deliz or returning his calls. (Deliz Dep. at 55:16-18).

Walker also contends that he was deemed a "complainer" because he asked for a dedicated week-day run. Walker cites Ferguson's testimony about an email from Primavera to Ferguson and four others, stating that Walker had been complaining because he wanted a dedicated run and did not like wait times. (Ferguson Dep. at 53:16-55:6, Ex. C). Significantly, Walker's request for Sundays off is not mentioned in the email or the cited testimony.

Lastly, Walker asserts that Harned suggested to Primavera that Walker should "disappear." (Dkt. 23 at 1,7). However, the actual statement in Harned's response to Primavera's email about Walker complaining was that he "either needs to disappear or run OTR." (Harned Dep. at 48:23-24). And Harned explained that by "disappear" he meant either pursue other employment or run over-the-road again because he had been offered numerous local opportunities that had not worked out. (*Id.* at 48:25-49:11).

The use of "uncooperative," "problematic," and "complaining" to describe Walker and his

17

conduct was largely unrelated to his request for an accommodation. To the extent Ferguson determined that he would be "problematic" on the T.G. Lee run because of his request for Sundays off, Indian River explains that the T.G. Lee run was seven days a week and required flexibility as it often required drivers to wait unpredictable lengths of time or arrive early and on short notice.[13] (*See* Deliz Dep. at 40:3-22, 42:2-43:1). Notwithstanding, the isolated, one-time use of these words does not rise to the level of an adverse employment action. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1242 (11th Cir. 2001) (plaintiff can not recover on a Title VII claim based "only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations" because negative job evaluations, unless accompanied by a demotion or loss in pay, are not tangible adverse employment actions).

**Constructive discharge**

"To show constructive discharge, the employee must prove that his working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign." *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991) (citation and quotation omitted). The question posed, therefore, is whether "a reasonable juror [could] conclude that the working conditions endured by [Walker] were so intolerable as to compel a reasonable person to resign?" *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003). The answer is no.

While Walker may have subjectively perceived that he was being closely watched, no reasonably objective employee would have resigned because of what he describes. And none of the comments he complains about were made to directly to him. While an employee subjected to such

---

[13] Walker had only been on the T.G. Lee run for approximately two weeks before he requested Sundays off. (*See* Walker Dep. at 181:17-21).

comments might subjectively perceive them to be unfair, inappropriate, or intolerable, in light of the record evidence, a reasonable employee in Walker's position would not have felt compelled to resign. *See Hill*, 934 F.2d at 1527 (formal written reprimand, criticism by supervisors, and the withdrawal of the supervisor's customary support of the employee's department, which occurred over a short period of time, did not create intolerable working conditions that would compel a reasonable person to resign).

Indeed, Walker testified that he resigned on May 3 because he thought he was going to be terminated when Ferguson asked him to bring his truck in after the brakes locked up. (Walker Dep. at 149:7-150:7). But in April, Walker had applied for a job in Key West, explaining that he would be relocating there. (Walker Dep. at 188-90, 204-05; Exh. 47). As Defendant correctly argues, an employee who voluntarily quits his job, absent a constructive discharge, has no Title VII claim. And, as Defendant points out, if Walker believed his working conditions had become intolerable, by quitting, he failed to exercise reasonable efforts to enable Indian River to address and rectify his concerns. Generally, a constructive discharge claim will not survive if the employer was not given the time to remedy the situation. *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).

Walker simply does not meet the high standard of demonstrating constructive discharge. He admits that he quit to avoid being fired. He was never disciplined. And his perceived mistreatment does not rise to the level that would have prompted a reasonable driver to resign.

**G.**   **Retaliation**

Relying on essentially the same actions and statements he attributes to Indian River, Walker contends that Defendant retaliated against him for requesting an accommodation and filing a

complaint with the EEOC.[14] He claims Indian River refused to offer him non-Sunday runs, labeled him a complainer, subjected him to heightened surveillance, discipline and hostility, offered him inferior, lower paying runs, portrayed him as uncooperative, took his truck, assigned him inferior equipment, and ultimately constructively discharged him.

Defendant argues that all of Walker's retaliation contentions, other than his removal from the T.G. Lee run because he requested Sundays off, are outside the scope of his EEOC charge. However, "[i]t is unnecessary for a plaintiff to exhaust administrative remedies prior to filing a judicial claim of retaliation if that claim grew 'out of an earlier charge,' because the 'the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court.'" *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 892 (11th Cir. 2014) (quoting *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988)).

To the extent Walker alleges actions by Indian River that were in retaliation for filing his EEOC complaint, he was not required to exhaust administrative remedies. In any event, Walker fails to establish a prima facie case of retaliation, since he did not suffer an adverse employment action.

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a causal link between the two. *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 856 (11th Cir. 2010). A materially adverse action is one that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Reeves v. DSI Sec. Servs., Inc.*, 395 Fed. Appx. 544, 547 (11th Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)). "'[P]etty slights, minor annoyances, and simple lack of good manners' generally do not rise to the level of materially adverse actions." *Id.* at 547 (quoting

---

[14] Walker signed his EEOC charge on April 18, 2014, which was received by the EEOC on April 21. (Dkt. 14-13, Ex. 31).

*Burlington Northern*, 548 U.S. at 68). As for the causation element, Title VII retaliation claims require "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). This is proved according to traditional principles of but-for causation. *Id.*

It is undisputed that Walker engaged in protected activity when he requested Fridays off as a religious accommodation and when he filed his EEOC complaint. However, as discussed, there is no evidence that he was subjected to materially adverse employment actions in retaliation for engaging in protected activity. Nor can his assertion, even if accepted as true, that he was only offered low paying runs be said to be materially adverse, considering there is no evidence that drivers were guaranteed runs or a certain level or rate of pay. *See Reeves*, 395 F. App'x at 547 (denying opportunities to work overtime where employer did not guarantee overtime to employees did not rise to the level of an adverse action for purposes of the plaintiff's retaliation claim).

Finally, the three-week period with no runs was not causally related to Walker's EEOC complaint, since that occurred before he filed the EEOC complaint. Indeed, after Defendant learned of the EEOC complaint, Walker worked four times, then quit. Walker fails to establish that he suffered a materially adverse action and therefore fails to make out a prima facie case of retaliation.

**A few final observations**

In his response to Defendant's summary judgment motion, Plaintiff puts his own spin on what he contends are disputed facts. If one ignores the record evidence and fails to read the deposition and exhibit citations in Plaintiff's response, his response reads as a compelling case of religious discrimination. However, Plaintiff not only takes liberty with the facts, he makes factual argument that is entirely unsupported by the record evidence, and proffers factually inaccurate

contentions.

For example, in his response to Defendant's summary judgment motion, Plaintiff contends: "Not only did Defendant refuse to give Plaintiff time off on Sundays as requested, it actually began scheduling him for *more* Sunday work and fired him when he objected." (emphasis in original) (Dkt. 23, p. 1). That statement is indisputably false. Plaintiff was not "fired." He resigned. (Walker Dep. at 149:7-150:7).

And while Plaintiff was offered some runs which required Sunday work after he was removed from the T.G. Lee run, two of which he accepted, he was offered considerably more runs that did not require Sunday work, as summarized in the discussion at p. 9-11 above. As noted, it is undisputed that after he was removed from the T.G. Lee run, he worked nine non-Sundays and two Sundays, and declined work on April 18, a Friday.

Plaintiff accuses Defendant of "misleadingly" suggesting that "during April 2014, Primavera attempted to contact Plaintiff but could not get a hold of him," arguing that "[t]his assertion is not supported by the record evidence." (Dkt. 23, p. 6). And he contends that "Defendant's own telephone records show that Defendant's first attempt to call him was on April 15, 2015," citing Exhibit B to Primavera's deposition and Exhibit D to the Deliz deposition, parenthetically noting "no attempt to call during the two weeks prior to April 15, 2914."(Id.).(Dkt. 23, p. 6). Those contentions find no support in the cited exhibits, and in fact, are contradicted by the exhibits.

First, Primavera deposition Exhibits A and D, Indian River's telephone records, as discussed below, show numerous telephonic contacts between Indian River and Walker throughout March and during the first week of April. Second, Exhibit D to the Deliz deposition, Primavera's April 15 email to Ferguson, flatly contradicts Plaintiff's accusation that Defendant's contention is misleading. In her email, Primavera tells Ferguson that "[t]he last time I spoke with him was over two weeks ago,

as I recall the only conversation I had with him was about that he wanted a dedicated run." And she went on to tell him *"I cannot leave a message because his voice mail is not set up."* By inference, these statements support Defendant's contention. And the inference Plaintiff suggests, that there were no attempts to contact him prior to April 15 is belied by the very telephone records he relies on.

Next, Plaintiff states unequivocally: "No phone or other communications were made to Plaintiff to offer him any runs prior to Defendant learning of the filing of his [EEOC] Charge." (Dkt, 23, p. 7). That statement is likewise not supported by the record evidence or cited exhibits.

Plaintiff signed the EEOC complaint on April 18, it was received by EEOC on April 21, and Indian River learned of it only when Ferguson received a letter or call from the EEOC. The very exhibit Plaintiff relies on, Exhibit A to Primavera's deposition, Indian River's telephone records, demonstrates that his statement is indisputably inaccurate. There were calls to and from Walker on April 7, 15, 16 and 18, and several calls on April 21, the day the EEOC received the complaint. (Dkts. 14-8, 14-9). Moreover, the Movement Display chart shows that Walker worked on March 17, 18, and 25, no-showed on March 27, worked on March 29, 31, and again on April 1, necessarily demonstrating communication with Plaintiff in which runs were offered, before Plaintiff's EEOC complaint was received by the EEOC.

Moreover, when Plaintiff contends (Dkt. 23, p. 8-9; 13-14) that "after he requested a religious accommodation," "the majority of runs offered to him after this request required Sunday work," and "Defendant did not offer [non-Sunday] runs to Plaintiff," he either ignores the record evidence discussed above or proffers an indisputably inaccurate statement. Indeed, just two pages later, Plaintiff references "the couple of runs which Plaintiff was offered that did not involve Sunday work . . ." (Dkt. 23, p. 10). Either he was or was not offered non-Sunday runs. Plaintiff cannot have it both

ways. Rather, the record evidence shows without dispute that he was offered and accepted at least nine non-Sunday runs after he requested Sundays off.

Finally, Plaintiff argues that he "was not offered any work whatsoever for <u>weeks</u> after his request for religious accommodation . . ." (Dkt. 23, p. 14)(emphasis added). That statement is likewise indisputably inaccurate. As noted, after his conversation with Deliz and Godwin on March 15, Walker worked March 17, 18, 25, no-showed on March 27, worked March 29 and 31, and again on April 1,  21, 22, 27, 29, and 30.

### Conclusion

Defendant's Revised Motion for Summary Judgment (Dkt. 22) is therefore **GRANTED**. The Clerk is directed to **ENTER FINAL JUDGMENT** in favor of Indian River Transport Company and against Bobby Walker and **CLOSE** this file. Defendant's Motion to Dismiss (Dkt. 27), Plaintiff's Motion to Strike (Dkt. 28), Defendant's Motion in Limine (Dkt. 36), and Plaintiff's Motion to Allow Electronic Equipment (Dkt. 38) are **DENIED** *as moot*.

**DONE AND ORDERED** this 26th day of January, 2017.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record